RECEIVED IN CLERKS OFFICE

# United States District Court
# District of Massachusetts

2005 DEC 14 P 9 39

U.S. DISTRICT COURT
DISTRICT OF MASS.

BANKRPUTCY APPEAL

IN RE: <u>HARRIET MENEZES</u>

CIVIL ACTION NO. <u>05-40052-MLW</u>

## REPLY BRIEF OF THE APPELLANT,
## EDUCATIONAL CREDIT MANAGEMENT CORPORATION

JOHN F. WHITE, ESQ.
BBO #558367
TOPKINS & BEVANS
150 Grossman Drive, Suite 305
Braintree, MA 02184
(781) 849-5906

TROY A. GUNDERMAN
MN BAR #308298
EDUCATIONAL CREDIT MANAGEMENT
  CORPORATION
101 East Fifth Street, Suite 1600
St. Paul, MN 55101
(651) 325-3252

Dated: October 17, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ......................................................................................... 1

STANDARD OF REVIEW ........................................................................... 1

ARGUMENT ............................................................................................... 3

I.      THE BRUNNER TEST SHOULD BE ADOPTED BY
THIS COURT AS THE SINGULAR TEST FOR
DISCHARGING STUDENT LOANS AS THE
BRUNNER TEST BEST SATISFIES THE
STRINGENT STANDARDS REQUIRED FOR
DETERMINING A DISCHARGE OF STUDENT
LOANS. .................................................................................... 3

      A.    The Brunner test provides a proper and measurable
standard for determining undue hardship. ...................... 4

      B.    Menezes argument for adoption of the totality of
the circumstances test ignores the overwhelming
weight of authority and majority of circuits that
have adopted Brunner. ..................................................... 7

II.     THE RECORD ESTABLISHES THAT THE DEBTOR
IS ABLE TO MAINTAIN A MINIMAL STANDARD
OF LIVING WHILE REPAYING THE STUDENT
LOANS. .................................................................................... 8

      A.    The trial record establishes that after payment of
monthly necessary expenses Menezes has
disposable income of $1,396.94 each month which
she may use to pay her student loans. ............................ 8

B.  The trial record establishes that any future
    increases in Menezes necessary expenses are
    minimal at best and will not interfere with her
    ability to repay her student loans and maintain a
    minimal standard of living. .......................................... 10

C.  In her brief Menezes distorts the William D. Ford
    Program which provides federal loan consolidation
    options that would allow Menezes to repay her
    student loans without an undue hardship. ................... 18

    i)   Under the tax code it not reasonable to
         believe that Menezes will experience tax
         liability twenty-five years in the future when
         the ICRP Plan ends. ........................................... 20

    ii)  Even if the Court finds that it is reasonably
         foreseeable that Menezes may have a tax
         liability at the end of the ICRP Plan, the
         ICRP Plan is still a viable option in light of
         26 C.F.R. § 301.7122-1. ..................................... 22

    iii) The lower court was clearly erroneous in
         finding that Menezes did not have the
         financial capacity to make payments under
         the Ford Program. .............................................. 24

III. MENEZES FAILS THE FIRST AND SECOND
     PRONGS OF THE TOTALITY OF THE
     CIRCUMSTANCES TEST AND ALSO FAILS THE
     FIRST AND SECOND PRONGS OF THE BRUNNER
     TEST. ..................................................................................... 26

A.  There are not any unique or additional
    circumstances to support a finding of undue
    hardship. ....................................................................... 27

iii

IV.    MENEZES HAS NOT MADE GOOD FAITH
       EFFORTS TO REPAY HER STUDENT LOAN. ................. 29

CONCLUSION ........................................................................................... 30

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................... 32

CERTIFICATE OF SERVICE .................................................................... 33

## TABLE OF AUTHORITIES

**CASES:**

Andrews v. S.D. Student Loan Assistance Corp.,
      661 F.2d 702 (8th Cir.1981) ................................................................ 6

Bourque v. Educ. Credit Mgmt. Corp. (In re Bourque),
      303 B.R. 548 (Bankr.D.Mass.2003) .................................................. 27

Brunner v. New York State Higher Education Services Corp.
      (In re Brunner), 831 F.2d 395 (2d Cir. 1987) ........................... *passim*

Burkhead v. United States (In re Burkhead),
      304 B.R. 560 (Bankr.D.Mass.2004) .................................................. 27

Coutts v. Mass. Higher Educ. Corp. (In re Coutts),
      263 B.R. 394 (Bankr. D. Mass. 2001) ......................................... 3n, 4

Dolan v. American Student Assistance (In re Dolan),
      256 B.R. 230 (Bankr. D. Mass. 2000) .............................................. 29

Ekanasi v. The Educational Resources Institute,
      325 F.3d 541 (4th Cir. 2003) .............................................................. 5

Hemar Ins. Corp. of Am. v. Cox (In re Cox),
      338 F.3d 1238 (11th Cir. 2003) .......................................................... 5

iv

Hicks v. Educational Credit Management Corporation (In re Hicks),
  --- B.R. ----, 2005 WL 2271837, *9
  (Bankr.D.Mass. September 12, 2005) ............................................... 7n

In re Holzer, 33 B.R. 627 (Bankr. S.D.N.Y. 1983) ........................................ 4

In re Parker, 328 B.R. 548 (8th Cir. BAP) .................................................... 27

In re Polleys, 356 F.3d 1302 (10th Cir. 2004) ............................................. 5

In re Roberson, 999 F.2d 1132 (7th Cir. 1993) ............................................ 5

In re Smith, 328 B.R. 605 (B.A.P. 1st Cir. 2005) ........................... 10, 11, 16

Kelly v. Educational Credit Management Corporation,
  312 B.R. 200 (B.A.P. 1st Cir. 2004) .................................................... 2

Kopf v. United States Dept. of Educ. (In re Kopf),
  245 B.R. 731 (Bkrtcy.Me. 2000) ........................................ 7, 9, 18, 25

Long v. Educational Credit Management Corporation,
  322 F.3d 549 (8th Cir. 2003) ............................................................ 2, 6

Oyler v. Educational Credit Management Corporation,
  397 F.3d 382 (6th Cir. 2005) ............................................................. 5

Pa. Higher Educ. Assistance Agency v. Faish (In re Faish),
  72 F.3d 298, 306 (3rd Cir. 1995) ........................................... 4, 5, 6, 26

Rose v. United States Department of Education, et. al.,
  277 B.R. 518 (W.D. Missouri 1998) ............................................. 2, 23

Savage v. Educational Credit Management Corporation,
  311 B.R. 835 (B.A.P. 1st Cir. 2004) ............................................. 2, 27

Smith v. Educational Credit Management Corporation,
  328 B.R. 605 (B.A.P. 1st Cir. 2005) ................................................. 1-2

TI Fed. Credit Union v. Delbonis,
  72 F.3d 921 (1st Cir. 1995) .................................................................. 1

v

United States Aid Funds, Inc. v. Pena (In re Pena),
155 F.3d 1108 (9th Cir. 1998) .......................................................... 2, 5

United States Dep't of Educ. v. Gerhardt (In re Gerhardt),
348 F.3d 89 (5th Cir. 2003) .................................................................. 5

Woodcock v. Chem. Bank (In re Woodcock),
45 F.3d 363 (10th Cir. 1995) ...................................................... 2, 4, 5

United States Code

11 U.S.C. § 523(a)(8) .................................................................. *passim*
26 U.S.C. § 108(a)(1)(B), (3) ............................................................ 21

Code of Federal Regulations

26 C.F.R. § 301.7122-1 ............................................................. 22, 23
34 C.F.R. 685, sections 685.100 through 685.402 ........................... 19
34 C.F.R. 685.209 ............................................................................. 20
34 C.F.R. 685.210 ............................................................................. 20

**MISCELLANEOUS:**

125 Cong. Rec. S9160 (daily ed. July 11, 1979) ........................................... 3

Pub. L. No. 101-647 (1990) (codified at 11 U.S.C. § 523(a)(8)(A)
(1988 Supp. V 1993) ......................................................................... 3n

Pub. L. No. 105-244, 112 Stat. 1581 (1998) ................................................ 3n

## INTRODUCTION

This reply brief is presented by the appellant, Educational Credit Management Corporation ("ECMC") in response to the appellee brief filed by the appellee, Harriet Menezes (hereinafter "Menezes"). ECMC expressly incorporates herein its' appellant brief that was previously filed with this Honorable Court.

## STANDARD OF REVIEW

Menezes argues in her brief that the proper standard of review for the legal conclusions of the lower court finding is "clear error". Appellee brief page 1. That assertion by Menezes is erroneous as the First Circuit Court of Appeals has noted that "Appellate courts review bankruptcy findings of fact under the clearly erroneous standard, but subject legal conclusions drawn by such courts to *de novo* review." (citations omitted) (emphasis added) *TI Fed. Credit Union v. Delbonis*, 72 F.3d 921, 928 (1st Cir. 1995). Therefore, the lower court's legal conclusions that the debtor established an undue hardship are properly subject to *de novo* review.

In reviewing § 523(a)(8) determinations, the Bankruptcy Appellate Panel for the First Circuit has also employed the *de novo* standard of review for legal conclusions of undue hardship and the clearly erroneous standard for findings of fact. *See Smith v. Educational Credit Management*

*Corporation*, 328 B.R. 605, 609 (B.A.P. 1st Cir. 2005), *Savage v. Educational Credit Management Corporation*, 311 B.R. 835, 837 (B.A.P. 1st Cir. 2004), and *Kelly v. Educational Credit Management Corporation*, 312 B.R. 200, 204 (B.A.P. 1st Cir. 2004).

Such standards are consistent with other Circuit decisions analyzing the appropriate standard of review for § 523(a) (8) determinations. Whether the bankruptcy court adopted the proper legal standard in determining the existence of "undue hardship" under 11 U.S.C. § 523(a) (8) and correctly applied that standard to the facts of this case are questions of law that are reviewed de novo. *Woodcock* v. *Chem. Bank (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir. 1995), see *Long v. Educational Credit Management Corporation*, 322 F.3d 549, 553 (8th Cir. 2003) (The only circuit that presently follows the totality of the circumstances test noting "...we agree with our sister circuits. The conclusion that appellee's student loans impose an undue hardship is a legal question to be reviewed *de novo*."). Any factual findings underlying a determination of undue hardship are reviewed under a clearly erroneous standard. *In re Rose*, 227 B.R. 518, 524 (W.D.Mo. 1998).

3

## ARGUMENT

**I.    THE *BRUNNER* TEST SHOULD BE ADOPTED BY THIS COURT AS THE SINGULAR TEST FOR DISCHARGING STUDENT LOANS AS THE *BRUNNER* TEST BEST SATISFIES THE STRINGENT STANDARDS REQUIRED FOR DETERMINING A DISCHARGE OF STUDENT LOANS.**

The dischargeability of an educational loan is governed by 11 U.S.C. § 523(a)(8). The bill that eventually became Section 523(a)(8) was intended to preserve the "stability and integrity" of the entire student loan program and to "assure that future generations of students will also have an educational loan available to them in their pursuit of a higher education." 125 Cong. Rec. S9160 (daily ed. July 11, 1979) (remarks of Sen. De Concini) [1] To ensure the continuing availability of student loans for future students, the statute requires a showing of "undue" hardship and mere "garden-variety" hardship is an insufficient excuse for a discharge of student loans. *See United States Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108, 1111 (9th Cir. 1998). "[Congress] clearly sought to curb what was an

---

[1]    As originally enacted, Section 523(a) (8) made educational loans nondischargeable unless the loan was due and payable for at least five years before the petition was filed or repayment would cause undue hardship. 11 U.S.C. § 523(a) (8) (1978).    The five-year period was subsequently increased to seven, see Pub. L. No. 101-647 (1990) (codified at 11 U.S.C. § 523(a) (8) (A) (1988 Supp. V 1993)), and then eliminated from the statute altogether, see Pub. L. No. 105-244, 112 Stat. 1581 (1998), thus "leaving only the more stringent 'undue hardship' standard to obtain discharge of those debts." *Coutts v. Mass. Higher Educ. Corp. (In re Coutts)*, 263 B.R. 394, 399 (Bankr. D. Mass. 2001).

apparent abuse of the student loan financing program by eliminating unconditional discharges of student loans due and payable longer than 7 years, leaving only the more stringent "undue hardship" standard to obtain discharge of those debts." *In re Coutts*, 263 B.R. 394, 399 (Bankr. D. Mass. 2001). Present inability of a debtor to pay her student loans does not constitute an extraordinary circumstance that requires a finding of undue hardship. *In re Holzer*, 33 B.R. 627 (Bankr. S.D.N.Y. 1983).

## A. The *Brunner* test provides a proper and measurable standard for determining undue hardship.

To satisfy the *Brunner* test the debtor must prove:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;  (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans;  and (3) that the debtor has made good faith efforts to repay the loans. *Brunner* at 396.

If one of the elements of the test is not proven, the inquiry ends, and the student loan cannot be discharged. *Pa. Higher Educ. Assistance Agency* v. *Faish (In re Faish),* 72 F.3d 298, 306 (3rd Cir. 1995). The debtor bears the burden of proving all three prongs of the undue hardship test. *See Woodcock,* 45 F.3d at 367. The *Brunner* test, with its requirement under the third prong for a showing of good faith, has been analyzed in detail and

widely accepted by almost all of the circuit courts of appeals nationwide. Those courts include the Second Circuit *Brunner,* 831 F.2d at 395 (2nd Cir. 1987), Third Circuit *Pa. Higher Educ. Assistance Agency* v. *Faish (In re Faish),* 72 F.3d 298, 305 (3rd Cir. 1995), Fourth Circuit *Ekanasi v. The Educational Resources Institute*, 325 F.3d, 541 (4th Cir. 2003), Fifth Circuit *United States Dep't of Educ. v. Gerhardt (In re Gerhardt),* 348 F.3d 89, 91 (5th Cir. 2003), Sixth Circuit *Oyler v. Educational Credit Management Corporation*, 397 F.3d 382 (6th Cir. 2005), Seventh Circuit *In re Roberson,* 999 F.2d 1132, 1135 (7th Cir. 1993), Ninth Circuit *In re Pena,* 155 F.3d 1108, 1112 (9th Cir. 1998), Tenth Circuit *In re Polleys,* 356 F.3d 1302 (10th Cir. 2004), and Eleventh Circuit *Hemar Ins. Corp. of Am. v. Cox (In re Cox),* 338 F.3d 1238, 1241 (11th Cir. 2003).

ECMC submits that the *Brunner* test best satisfies the stringent standards required for the discharge determination and that is why the *Brunner* test has been adopted by the vast majority of courts. *See Woodcock v. Chem. Bank (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir. 1995). *Brunner* has gained such wide acceptance because it provides a test based on well-defined standards that can be understood by debtors, applied consistently by bankruptcy courts, and reviewed effectively by appellate courts. It also promotes the policies and purposes of Section 523(a)(8).

Moreover, the *Brunner* test is "the most consistent with the scheme that Congress established," is "the most logical and workable" of the various tests adopted by courts, and provides a "concise" formulation that is "eas[y] to follow and to apply." *In re Faish,* 72 F.3d at 305-06.   ECMC submits that the test developed in *Brunner* is the best method for achieving uniformity and consistency in the application of Section 523(a)(8) and giving due judicial consideration to the circumstances of individual debtors while respecting the policy choices made by Congress regarding student loan dischargeability.

ECMC notes that only the Eighth Circuit follows the totality of the circumstances test.   The Eighth Circuit adopted the totality of the circumstances test in 1981 before the *Brunner* decision issued six years later in 1987. *Andrews v. S.D. Student Loan Assistance Corp.*, 661 F.2d 702 (8th Cir.1981). In 2003, the Eighth Circuit Court of Appeals rejected a request to adopt the *Brunner* test in part because it was bound by the prior adoption of the totality of the circumstances test in 1981 in the *Andrews* case. *Long v. Educational Credit Management Corporation,* 322 F.3d 549, 553 (8th Cir. 2003).

**B.    Menezes argument for adoption of the totality of the circumstances test ignores the overwhelming weight of authority and majority of circuits that have adopted *Brunner*.**

In Menezes brief, she requests this Court to adopt the totality of the

circumstances test, rather than the *Brunner* test, as the singular test in the

First Circuit for determining undue hardship.   In support of her request,

Menezes alleges that a plain reading of § 523(a)(8) shows that the statute

does not require a court to examine the prior "good faith" efforts of a debtor

to repay her student loans and therefore this Court should not adopt *Brunner*.

Appellee brief page 23.   Menezes cites only one case, *Kopf* v. *United States*

*Dept. of Educ. (In re Kopf)*, 245 B.R. 731 (Bkrtcy.Me. 2000) in support of

her position that § 523(a)(8) does not require an examination of her prior

"good faith" efforts to repay her student loans. Appellee brief page 23.   With

due respect to the *Kopf* decision, ECMC notes that Menezes contention is

incorrect as except for the Eighth Circuit (and the First Circuit which has not

yet adopted a test) all of the remaining circuits have adopted *Brunner* and

overwhelmingly found that a debtor must show evidence of prior good faith

efforts to repay student loans in seeking a discharge under § 523(a)(8).[2]

---

[2]    ECMC notes that subsequent to the issuance of the decision in the case at bar, the lower court announced that it would also follow the reasoning in *Kopf* and adopted the totality of the circumstances test.   See *Hicks v. Educational Credit Management Corporation* (In re Hicks) --- B.R. ----, 2005 WL 2271837, *9 (Bankr.D.Mass. September 12, 2005).

## II.    THE RECORD ESTABLISHES THAT THE DEBTOR IS ABLE TO MAINTAIN A MINIMAL STANDARD OF LIVING WHILE REPAYING THE STUDENT LOANS.

### A.    The trial record establishes that after payment of monthly necessary expenses Menezes has disposable income of $1,396.94 each month which she may use to pay her student loans.

Menezes confirms in her brief that her actual monthly expenses at the time of trial amounted to approximately $1,018.66. Appellee brief page 12 and A. 77B. Menezes further confirmed at trial that an accurate calculation of her monthly wages from her primary position is $2,417.70 net per month. ($1,115.86 multiplied by 26 pay periods and divided by 12 months per year) (A. 158-160). Her attorney stipulated during trial that her current net income from her primary position should be about $2,415.60 per month. (A. 160). Based on testimony and stipulation, Menezes current net monthly income is either $2,415.60 or $2,417.70, the difference of $2.10 not being material to this matter. (A. 158-160). Therefore, the record establishes that Menezes disposable income after necessary expenses is approximately $1,396.94. The record also shows that at the time of trial the total payments on all of the ECMC held student loans amounted to: 1) $358.01 over 20 years; 2) $314.88 over 25 years; and 3) $293.34 over 30 years. (A. 34 – 35, 89). Accordingly, Menezes has the net income available to repay her ECMC held student loans. Therefore, Menezes own testimony and the record show

that the Menezes is currently and for the foreseeable future able to make payments on her student loans.

As such, the bankruptcy court committed clear error in its factual findings that Menezes did not have sufficient income to repay her student loans.

Further, the bankruptcy court erred in its application of these findings to the undue hardship test. Menezes fails the first and second prong of the totality of circumstances test which requires courts to determine, respectively, the ability of the borrower to make loan payments and to calculate the reasonable necessary living expenses of the debtor. *See Kopf,* 245 B.R. at 745. Menezes has the income to pay her loans and still pay her necessary expenses. Similarly, if applying the *Brunner* test, the debtor's expenses would be considered within the first prong, in determining whether the debtor can maintain a minimum standard of living and repay her student loans, and under the third prong when reviewing future ability to pay. Under either *Brunner* or the totality of the circumstances test, the record shows that Menezes can make payments on the loans, pay her necessary expenses, and maintain a minimal standard of living. Accordingly, the legal conclusions reached by the lower court that an undue hardship existed were erroneous and should be reversed. As cited above, the legal conclusions of

the lower court herein are subject to *de novo* review by this Honorable Court.

**B.    The trial record establishes that any future increases in Menezes necessary expenses are minimal at best and will not interfere with her ability to repay her student loans and maintain a minimal standard of living.**

Menezes argues in her brief that her expected future necessary expenses will be greater; such that she will in the future be unable to make payments on the student loans. Appellee brief page 12. Upon review, it is clear Menezes arguments are incorrect as the record shows that increases, if any, in her future expenses will be minor in amount and not result in an inability to make payments on the student loans. ECMC notes that the debtor bore the burden of proving her reasonable necessary future expenses and the lower court would have committed clear error by identifying and quantifying future expenses without any supporting evidence in the record. See *In re Smith,* 328 B.R. 605, 611, 613 (B.A.P. 1st Cir. 2005).

**i) Rental subsidy:** Menezes argues that the record shows that in the future she may possibly lose her rental subsidy of $600.00 per month. Appellee brief page 12. That contention is clearly erroneous, as Menezes testified she would not lose her rent subsidy if she earned less than $30,000 for the year. (A. 163-165). Menezes confirmed at trial that she expected to earn less than $30,000.00 for the year. (A. 163- 164, 179). Therefore, there

is no evidence in the record to support Menezes argument that she will lose her rental subsidy. Correspondingly there is no evidence in the record to support Menezes contention that her rental expense will increase by $600.00. As there is nothing in the record to support the contention of a rental expense increase from a loss of Menezes subsidy; it would be clearly erroneous for the Court to attempt to quantify and put a dollar figure on this projected expense. *In re Smith*, 328 B.R. 605, 613 (B.A.P. 1st Cir. 2005).

**ii) Internet service/cellular phone/home phone expenses:** Menezes argues that the record shows that she will likely in the future have to obtain internet service, a cellular phone and a home phone for her job. Appellee brief page 12. Menezes testified that her home phone is currently subsidized but she expects to lose the subsidy; although she put in no evidence as to the amount of the subsidy that she expected to lose. (A. 118 – 119). What is known for certain is that Menezes schedule J, estimate of expenses, showed a current expense of $86.09 for both a home phone and a cell phone. (A. 77B). Therefore, Menezes current monthly expenses of $1,018.66 already included an expense for a cellular phone and, in part, a home phone. (A. 77B). Menezes did testify that she believed internet access would cost her $24.00 per month. (A. 118). But beyond the projected increase of $24.00 for internet service, Menezes never established by what amount of money, if

any, her future expenses would increase in the event she lost her phone subsidy. As there is nothing in the record to establish the increase in amount, if any, of this expense beyond $24.00, it would be clearly erroneous for the Court to attempt to quantify and put a further dollar figure on this projected expense. *Id.* at 613.

**iii) Food expense:** While away on trips Menezes is provided with a meal allowance from her employer; but she argues that in the future the meal allowance will be insufficient to pay for her food needs as she begins to work more. Appellee brief page 12. ECMC notes that if the Menezes contemplates an increase in her food expenses due to an increase in traveling for her employer, this correspondingly establishes that in the future she may also expect an increase in income from such additional work. (A. 119). But, as to the food expense, Menezes testified on direct that she received a meal reimbursement of $60 to $80 for a three day trip. (A. 119–120). On cross-examination, Menezes testified that she expected to receive $330.00 in February 2005 from her employer for meal allowances. (A. 175, 178). Menezes also testified that at present she is currently able to eat three meals a day on $20.00. (A. 120). She further testified that she keeps her food costs down while traveling by going to supermarkets to buy food. (A. 120). So Menezes testified that her meal reimbursement is currently sufficient to

13

cover her food costs while she is away on work. But even if this Court

believes that the meal reimbursement does not cover all Menezes food costs

while traveling, Menezes never established by what amount of money, if

any, her future expenses would increase based upon a need to purchase food

in excess of the meal reimbursement. As there is nothing in the record to

establish the increase in amount, if any, of this expense, it would be clearly

erroneous for the Court to attempt to quantify and put a dollar figure on this

projected expense. *Id.* at 613.

**iv) Commuting expense:** Menezes argues that in the future she will

have an increase in her expenses for commuting as she begins to work more.

Appellee brief page 12. ECMC notes that if the Menezes contemplates an

increase in her commuting expenses, this correspondingly establishes that in

the future she may also expect an increase in income from such additional

work. (A. 119). But, as to the commuting expense, Menezes testified that

she currently is able to get to work through public transportation at an

expense of about $30.00 a month. (A. 120–121). Menezes testified that

public transportation is not running prior to 5:00 am. (A. 121) Therefore, if

she has a flight at 5:00 am, in order to get to work she has to rent a hotel in

Boston the night before she is scheduled to work or take a taxi to work. (A.

121). Menezes testified that in the month of February 2005, she had four

early morning flights and she thought it would cost her an additional $400.00 in February 2005 to get to work for those four flights. (A. 122). So if using a taxi to get to work, Menezes estimated four taxi rides in February at a cost of $100.00 per trip. (A. 122). Menezes testified only as to an increase in transportation costs for the month of February 2005, and not beyond. (A. 122). Therefore, there is nothing in the record to establish the increase in amount, if any, of this expense beyond the month of February 2005 and it would be clearly erroneous for the Court to attempt to otherwise quantify and put a dollar figure on this projected expense. *Id.* at 613.

ECMC also notes that the testimony of Menezes showed that in the future her transportation costs for getting to work will likely decrease; since she testified at trial that she had received $7,500 in settlement of a lawsuit and that she had given that $7,500 to her stepfather to purchase a car for her. (A. 158, 167-168). With her stated intent on the record to buy a car, it may reasonably be found that her transportation expense will decrease in the future.

**v) Medical expenses:** Menezes argues that the record shows that she will likely in the future have an increase in medical expenses due to a loss of medical coverage that had previously been provided through various forms of welfare or charity. Appellee brief page 12. Additionally, Menezes argues

15

that she will have a future increase in expenses due to costs associated with monitoring a brain tumor. Appellee brief page 12. Menezes testified that in the past she has been able to get health assistance through several charities. (emphasis added) (A. 102–103). Menezes testified that at present she receives health insurance through Mass Health and is also entitled to receive free health care at Emerson Hospital, Mass Eye & Ear Hospital, and Mass General Hospital. (emphasis added) (A. 102–103). Menezes testified that she experienced double vision but that she received treatment for the same at Mass Eye & Ear Hospital and Mass General Hospital. (A. 128). As to the monitoring of her brain tumor (which condition was not corroborated through any medical records or expert testimony and which condition is not hereby admitted) Menezes testified that her treatment is covered by Mass Health and consists of her getting a MRI every six months – although she is currently waiting for her treating doctor to approve her having an MRI. (A. 128). Based on Menezes testimony as to her having Mass Health insurance and her ability to receive free health care for her conditions at Emerson Hospital, Mass Eye & Ear Hospital, and Mass General Hospital;   it is reasonable to find that she will continue to have health insurance and additionally have the ability to seek free care and monitoring of her condition(s) through any of the aforesaid hospitals. (A. 102–103).

16

While Menezes testified that she currently has health care and also has the ability to receive free care at various hospitals; the record shows that she never testified that she would be in danger of losing her health care and/or opportunity for free medical care due to any change in her income or circumstances. In Menezes schedule J, she estimated a current expense of $-0- for medical and dental costs. (A. 77B). Therefore, Menezes never established by what amount of money, if any, her future health care costs would likely increase. As there is nothing in the record to establish the increase in amount, if any, of this expense, it would be clearly erroneous for the Court to attempt to quantify and put a dollar figure on this projected expense. *Id.* at 613.

In sum, beyond the estimate of $24.00 for internet access and a limited one month estimate of a $400.00 increase in transportation costs due to early flights, Menezes never reasonably established by what additional amount of money, if any, that her future expenses would likely increase. As there is nothing in the record to establish the increase in amount, if any, of Menezes future expenses it would be clearly erroneous for the Court to attempt to quantify and put a dollar figure on those projected expenses. *In re Smith* at 613.

However, *assuming arguendo*, that this Honorable Court were to factor in the $24.00 increase for the internet and additionally factor in the transportation expense of $400.00 as an ongoing expense, that would only increase Menezes current monthly expenses from $1,018.66 to $1,442.66. Based on testimony and stipulation, Menezes current net monthly income is either $2,415.60 or $2,417.70, the difference of $2.10 not being material to this matter. (A. 158-160). Therefore, in this scenario the record establishes that Menezes disposable income after necessary expenses is approximately $927.94. Payments on the ECMC held student loans amounted to: 1) $358.01 over 20 years; 2) $314.88 over 25 years; and 3) $293.34 over 30 years. (A. 34–35, 89). Accordingly, even factoring in these additional expenses, Menezes still has sufficient net income available to repay her ECMC held student loans. Therefore, the record establishes that Menezes at present and for the foreseeable future will be able to pay her ECMC student loans, maintain a minimal standard of living, and still have excess income each month.

As such, the bankruptcy court committed clear error in its factual findings that Menezes expenses were so great that she would not have sufficient income to repay her student loans.

18

Further, the bankruptcy court erred in its application of these findings to the undue hardship test. The second prong of the totality of circumstances test requires courts to calculate the reasonable necessary living expenses of the debtor. *See Kopf*, 245 B.R. at 745. Similarly, if applying the *Brunner* test, the debtor's expenses would be considered within the first prong, in determining whether the debtor can maintain a minimum standard of living and repay her student loans and under the third prong when reviewing future ability to pay. Under either *Brunner* or the totality of the circumstances test, the record shows that Menezes can make payments on the loans, pay her necessary expenses, and maintain a minimal standard of living. Accordingly, the legal conclusion reached by the lower court that an undue hardship existed were erroneous and should be reversed. As cited above, the legal conclusion of the lower court herein are subject to *de novo* review by this Honorable Court.

**C.    In her brief Menezes distorts the William D. Ford Program which provides federal loan consolidation options that would allow Menezes to repay her student loans without an undue hardship.**

Menezes argues in her brief that if she consolidates her student loans with the United States Department of Education, William D. Ford Direct Repayment Loan Program, then her student loan balances will thereby increase and she possibly faces a tax liability if the student loans are

discharged at the end of the repayment term.   Appellee brief page 19-22.

Menezes brief improperly characterizes how the Ford Program works.

The William D. Ford Direct Repayment Loan Program is codified within the Code of Federal Regulations at 34 C.F.R. 685, sections 685.100 through 685.402 (hereinafter "Ford Program").   Accordingly, the Ford Program is federal law and it is further noted that the lower court took judicial notice of the Ford Program. (A. 152)

The Ford Program offers four loan consolidation programs for Menezes, which at the time of trial had approximate monthly loan payments of:  1) Standard Repayment Plan over a 10 year term with fixed monthly payments of $576.72; 2) Extended Repayment Plan over a 25 year term with fixed monthly payments of $305.00; 3) Graduated Repayment Plan over a 25 year term with fixed monthly payments for the first two years commencing at $288.36; and 4) Income Contingent Repayment Plan over a 25 year term with initial monthly payments of $50.39.  (A. 38–41) and 34 C.F.R. 685, sections 685.100 through 685.402.

Under the Standard Repayment Plan, Extended Repayment Plan, and Graduated Repayment Plan the student loans are paid in full and have a zero balance at the end of the term.  (A. 38–41) and 34 C.F.R. 685, sections 685.100 through 685.402.  Therefore, Menezes is incorrect in her brief on

page 20 when she argues that payments under those three Ford options would be insufficient to cover the interest that accrues on the loans.

The Income Contingent Repayment Plan ("ICRP Plan") does allow for the interest to be added to the loan balance, although that amount is capped. (A. 38–41) and 34 C.F.R. 685.209 "Income Contingent Repayment Plan." However, at the end of the ICRP plan any remaining student loan indebtedness that remains owing is discharged. (A. 38–41) and 34 C.F.R. 685.209 "Income Contingent Repayment Plan." Also, after making three (3) consecutive monthly payments in the ICRP Plan, Menezes would then have the right to switch out of the ICRP Plan to any of the three other consolidation options offered under the Ford Program. See 34 C.F.R. 685.210.

### i) Under the tax code it not reasonable to believe that Menezes will experience tax liability twenty-five years in the future when the ICRP Plan ends.

It appears from Menezes brief that she contends that the ICRP Plan is not a viable option because she believes that 25 years from now when the ICRP Plan ends she may have a tax liability on the amount of the student loan indebtedness that is forgiven.

ECMC notes that this argument pre-supposes that Menezes never asserts her right to switch at a later date into any of the three other payment

options available under the Ford Program whereby she could fully pay off
her student loans. Yet, even if Menezes were to remain in the ICRP Plan for
the entire 25 years, her argument is still incorrect as under Section 108 of the
Internal Revenue Code the amount of indebtedness discharged would not be
included in her gross income to the extent that she is insolvent. 26 U.S.C. §
108(a)(1)(B), (3). *Therefore, an otherwise insolvent debtor realizes taxable
income from the cancellation of the student loan indebtedness at the end of
the ICRP Plan only if that cancellation causes him or her to have a positive
net worth.* See 26 U.S.C. § 108(a)(1)(B), (3).

Clearly, twenty-five years from now at the end of the ICRP Plan the
cancellation of Menezes student loan obligations would not thereby cause
her to have a positive net worth. Looking then to Menezes current finances
and future (and setting aside the fact that she presently is able to repay her
student loans), Menezes alleges her financial situation is bleak and will
remain bleak for the future. Based on Menezes view of her future, ECMC
submits that it is not reasonably foreseeable for this Court to find that 25
years from now Menezes will be sufficiently solvent such that she will have
a tax liability if the student loans are discharged through the ICRP Plan. But
again, if the Court believes that the Menezes finances will improve in the
future such that she may have a tax liability; then under the Ford Program as

22

her finances improve she will at that time have the ability to switch out of the ICRP Plan into any of the three other Ford Program consolidation options to repay her student loan debt in full.

Accordingly, the ICRP Plan is a viable option for Menezes that will allow her to maintain a minimal (or better) standard of living and repay her student loans without causing an undue hardship.

> **ii)** **Even if the Court finds that it is reasonably foreseeable that Menezes may have a tax liability at the end of the ICRP Plan, the ICRP Plan is still a viable option in light of 26 C.F.R. § 301.7122-1.**

Should this Court find that it is reasonable to foresee that Menezes may experience a tax liability 25 years from now at the end of the ICRP Plan; then ECMC respectfully states that such a finding of the Court would not thereby negate the viability of the ICRP Plan. Since, under the Code of Federal Regulations if there is doubt as to the collectibility of a tax debt the Internal Revenue Service is authorized to forgive tax debt through offers of compromise. 26 C.F.R. § 301.7122-1. Further, it must be remembered that if in fact a tax is assessed at the end of the ICRP Plan, the amount of the tax is not equal to the amount of loan indebtedness forgiven; but would instead be Menezes then individual tax percentage/rate applied to the amount of the indebtedness forgiven.

23

Menezes argues that her current finances are bleak and will remain bleak for the foreseeable future. Based on those arguments, if Menezes were 25 years in the future to experience a tax liability from the discharge of the student loans, it would be reasonable to find that she will be able to have the tax debt forgiven pursuant to 26 C.F.R. § 301.7122-1.

The issue of a future possibility of tax liability arising from the forgiveness of student loan debt was examined by the appellate court in the case of *Rose v. United States Department of Education, et. al.,* 277 B.R. 518, (W.D. Missouri 1998). The *Rose* court noted that future tax liability, if any, from forgiven student loan debt may be ameliorated as the Internal Revenue Service is authorized to forgive tax debt through offers of compromise if there is any doubt as to collectibility. *Id.* at 525–526, and citing 26 C.F.R. Section 301.7122-1. As the *Rose* court aptly noted, "If the Debtor's financial situation remains as morose as they believe it will, then forgiveness or compromise will be viable options." *Id.* at 526.

In light of the 25 year length of the ICRP Plan repayment period, the ability of Menezes to switch out of the ICRP Plan during that 25 year period into any of the three other Ford Program options, whether any cancellation of the student loan debt will in fact result in taxable income to Menezes, whether the cancellation of the student loan debt will in fact result in a tax

24

liability for Menezes, and whether the cancellation of the student loan debt will ultimately occur; ECMC submits that the potential for adverse income tax consequences to Menezes under the ICRP Plan are very speculative and so remote in time that the same should have little, if any, bearing on whether Menezes currently meets the standards for an undue hardship discharge as required by 11 U.S.C. § 523(a)(8).

### iii)    The lower court was clearly erroneous in finding that Menezes did not have the financial capacity to make payments under the Ford Program.

Menezes testified at trial that she was aware of the Ford Program but that she would not consider consolidating her loans into the ICRP Plan with its initial payment of approximately $50.00 per month.    (A. 150–151). Menezes argues in her brief that the lower court reasonably concluded that Menezes did not have the financial ability to make payments under the Ford Program.  Appellant brief page 21, citing A. 210.

The record establishes that Menezes in fact has the net income available to make payments on her student loans under the Ford Program, and in particular under the ICRP Plan with its initial payment of $50.39. There is nothing in the record to support the lower court's findings that

25

Menezes doesn't have the financial ability to make payments under the Ford Program.

As such, the bankruptcy court committed clear error in its factual findings that Menezes did not have the financial ability to make payments under the Ford Program.

Further, the bankruptcy court erred in its application of these findings to the undue hardship test. Menezes fails the first and second prong of the totality of circumstances test which requires courts to determine, respectively, the ability of the borrower to make loan payments and to calculate the reasonable necessary living expenses of the debtor. *See Kopf,* 245 B.R. at 745. Menezes has the income to pay her loans and still pay her necessary expenses. Similarly, if applying the *Brunner* test, the debtor's expenses would be considered within the first prong, in determining whether the debtor can maintain a minimum standard of living and repay her student loans and under the third prong when reviewing future ability to pay. Under either *Brunner* or the totality of the circumstances test, the record shows that Menezes can make payments on the loans, pay her necessary expenses, and maintain a minimal standard of living. Accordingly, the legal conclusions reached by the lower court that an undue hardship existed were erroneous

and should be reversed. As cited above, the legal conclusions of the lower court herein are subject to *de novo* review by this Honorable Court.

### III.    MENEZES FAILS THE FIRST AND SECOND PRONGS OF THE TOTALITY OF THE CIRCUMSTANCES TEST AND ALSO FAILS THE FIRST AND SECOND PRONGS OF THE BRUNNER TEST.

As noted prior herein, the record shows that Menezes can maintain a minimal standard of living and repay all of the student loans. Menezes therefore fails the first prong of the *Brunner* test. Although the failure of any prong of *Brunner* establishes that an undue hardship does not exist, the remaining two prongs of *Brunner* will be examined as well to establish that Menezes does not pass any of the three *Brunner* prongs. *Faish,* 72 F.3d at 30.

The second *Brunner* prong is predicated upon a finding that the Menezes must show additional circumstances to establish that she is currently and for a significant portion of the repayment period unable to maintain a minimal standard of living and repay the student loans. Menezes does not have any additional circumstances, whether unique, exceptional, or otherwise, which would prevent repayment of the student loans.

### A.   There are not any unique or additional circumstances to support a finding of undue hardship.

Whether applying *Brunner* or the totality of circumstances test the bankruptcy court needs to look at circumstances that would result in the inability to earn in the future. *Savage, 311 B.R.* at 839-840;   *see also Burkhead v. United States (In re Burkhead),* 304 B.R. 560, 566 (Bankr.D.Mass.2004);   *Bourque v. Educ. Credit Mgmt. Corp. (In re Bourque),* 303 B.R. 548, 550 (Bankr.D.Mass.2003), *In re Faish,* 72 F.3d 298, 307 (3d Cir.1995).

The record fails to show that there are additional or unique circumstances that would prevent Menezes from repaying her student loans in the future.   As noted herein and set forth in the record, if Menezes has any health conditions, those conditions do not prevent her from working. See *In re Parker*, 328 B.R. 548 (8th Cir. BAP) (court found that debtor's stated health conditions did not interfere with her ability to work).   Further, she has demonstrated for years that she is able to work and manage her stated conditions.

The record not only is absent of unique circumstances preventing repayment, it is full of evidence that Menezes financial fortunes will be improving in the future.   As evidenced by Menezes testimony that:   she is working full-time; she had been reinstated to her job without loss of

seniority;  she had received a payment of $7,500.00 from her union; she is

looking to buy a car which would improve her ability to work; she is

qualified to work as a cabin safety engineer which pays $60,000.00;  she is

looking to increase her education so she can get jobs in the future outside of

the airline industry; during the pendency of this action she applied for and

was accepted into six colleges; she is able to work-part time as a teacher; she

expected as of trial to begin receiving health, dental and life insurance

through her employer; and she doesn't have any dependents that would

perhaps interfere with her ability to work, full or part-time, or to change jobs

in the future.  (A. 54, 91, 110, 148-149, 158, 166-167, 172-173, 191-192),

As such, Menezes can not meet her burden with regards to the second

*Brunner* prong which requires a student loan debtor to establish that

"additional circumstances" exist that would preclude the debtor from

maintaining a minimal standard of living for herself and her dependents if

required to repay the student loans; and that those "additional

circumstances" are likely to exist for a significant portion of the student loan

repayment period.  *Brunner*, 831 F.2d at 396.  Similarly Menezes can not

satisfy the totality of circumstances test's first prong that requires courts to

examine not only the debtor's past and present finances but also their

reasonably reliable future financial resources.

Given such, Menezes did not meet her burden of proving undue hardship under either test, and thus the bankruptcy court could not properly have discharged any of her student loans.    Accordingly, the legal conclusions reached by the lower court that an undue hardship existed were erroneous and should be reversed.  As cited above, the legal conclusions of the lower court herein are subject to *de novo* review by this Honorable Court.

## IV.    MENEZES HAS NOT MADE GOOD FAITH EFFORTS TO REPAY HER STUDENT LOAN.

The third prong of Brunner involves determining the good faith of the debtor in attempting to repay and resolve the student loans.  Good faith is also a consideration, but not a separate test, in the Totality of the Circumstances analysis. *Dolan*, 256 B.R. at 238.

By itself, Meneze's decision not to consolidate her student loans through the Ford program is evidence of bad faith.  See ECMC Appellant brief citing cases finding debtor's bad faith established by failure to consolidate with Ford Program.   Given such, Menezes has not met her burden of proving undue hardship under either the third prong of the *Brunner* test and the Totality of the Circumstances test and thus the Bankruptcy court could not properly have discharged Menezes student loans.

## CONCLUSION

This Court should adopt the *Brunner* test as the singular test for determining whether a student loan should be discharged as the *Brunner* test best satisfies the stringent standards required for a determination of whether to discharge student loans. The record and pleadings show that Menezes did not meet her burden under either the *Brunner* test or the Totality of the Circumstances test and therefore her student loans should not have been discharged. The record establishes that the lower court was clearly erroneous in its finding that an undue hardship exists for Menezes and therefore the ruling of the lower court should be reversed and a ruling entered that the student loans are non-dischargeable.

In the event this Court finds the existence of an undue hardship herein, then this Court should discharge only such portion of Menezes student loan which the Court finds the repayment of which would constitute an undue hardship.

31

Respectfully submitted,

Educational Credit Management Corporation,
Appellant,

Troy A. Gunderman
MN Bar # 308298
First Circuit Bar # 90398
Educational Credit Management Corporation
101 East Fifth Street, Suite 1600
St. Paul, MN 55101
Telephone No. (651) 325-3252

John F. White, Esq. BBO# 558367
Topkins & Bevans
150 Grossman Drive, Suite 305
Braintree, MA 02184
Telephone No. (781) 849-5906

Dated: October 17, 2005

32

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance with Type-Volume Limitation Typeface Requirements, and Type-Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

__X__  this brief contains **6,972** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7(B)(iii), or

_____  this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

__X__  this brief has been prepared in a proportionally spaced typeface using [Word 2000] in [14 point, Times New Roman], or

_____this brief has been prepared in a monospaced typeface using [Word 2000] with [10 characters per inch, Courier New 12 point].

Troy A. Gunderman
MN Bar # 308298
First Circuit Bar # 90398
Educational Credit Management
Corporation
101 East Fifth Street, Suite 1600
St. Paul, MN 55101
Telephone No. (651) 325-3252

John F. White, Esq. BBO# 558367
Topkins & Bevans
150 Grossman Drive, Suite 305
Braintree, MA  02184
Telephone No. (781) 849-5906

Dated: October 17, 2005

33

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the Appellant's Reply Brief upon Philip F. Coppinger, Esquire, Seder & Chandler, 339 Main Street, Suite 300, Worcester, Massachusetts 01608 (508) 757-7721 and Stephen M. Nagel, Esquire, Office of the Attorney General, the Capital, Civil Recoveries Bureau, Albany, New York 12224 (518) 474-0594 by priority mail, postage prepaid.

Troy A. Gunderman
MN Bar # 308298
First Circuit Bar # 90398
Educational Credit Management
Corporation
101 East Fifth Street, Suite 1600
St. Paul, MN 55101
Telephone No. (651) 325-3252

John F. White, Esq. BBO# 558367
Topkins & Bevans
150 Grossman Drive, Suite 305
Braintree, MA 02184
Telephone No. (781) 849-5906

Dated: October 17, 2005